IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ANGELA M. MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-0632-CV-W-ODS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in September 1966. She has a high school education, is a licensed beautician, and has prior work experience as an office manager, furniture builder, bartender, waitress and cashier. She filed her applications for benefits in April 2006, alleging she became disabled on September 1, 2004, due to a combination of depression and a myriad of physical ailments.

The Record reveals that Plaintiff saw multiple doctors for treatment of fibromyalgia and headaches, but did not necessarily tell any of her doctors what other doctors were prescribing. The Record also reveals a pattern of drug-seeking behavior, drug abuse, and alcohol abuse.

Plaintiff moved to the Kansas City area from Arkansas in October 2003. In January 2004 Plaintiff slipped and fell on a patch of ice and went to the emergency room at Independence Regional Health Center ("IRHC"), complaining of pain in her left arm and back. During the examination Plaintiff identified the medications she was

taking as "Lasix, iron, potassium, B12, Dicyclomine, Cenistin, Hydrocodone, Amitriptyline and Clonazepam." Examination revealed tenderness but no deformity in her left elbow, left forearm, left shoulder and lumbar region, but no deformities were observed. R. at 286-87. X-rays revealed nothing noteworthy in Plaintiff's lumbar spine or forearm, and a possible torn rotator cuff in her right shoulder. R. at 288-90.

In May 2004 Plaintiff went to the emergency room at Independence Regional Medical Center complaining of migraines. She was prescribed Toradol, Benadryl, and Compazine. Approximately two weeks later Plaintiff sought treatment at Comprehensive Mental Health Services with complaints of depression and anxiety. She reported a history of drinking heavily but claimed her drinking was under control at the time. Plaintiff also reported that she was "prescribed 17 different" medications for daily use but that her prescriptions had expired. R. at 217-19. There is no indication that she mentioned the prescriptions she received from Independence Regional Medical Center or from IRHC. On June 2, Plaintiff again sought refills of her medication. She provided a confusing and contradictory history of her alcohol use. "She said that she started out by drinking socially but about four weeks ago when she lost her parents, she started drinking heavily." However, Plaintiff also said "that her heavy drinking lasted for about two years and then she started going to Outpatient Alcohol treatment program and started attending AA and was able to quit." In addition, Plaintiff testified that her parents died in 2000, R. at 59 – so, if she started drinking heavily when her parents passed away, the time period would have been more than four weeks. Ultimately, Plaintiff was prescribed Zoloft, Klonopin, and Sinequan and told to return in a month. R. at 214-16.

Meanwhile, on June 22, Plaintiff made an initial visit to University of Health Sciences. One week later Plaintiff reported that she suffered from fibromyalgia and migraines, but that Vicodin and Ultram were not helpful. Plaintiff was referred to neurology. R. at 231. The next day, Plaintiff returned to Comprehensive Mental Health Services, reporting that she suffered from fibromyalgia and seeking medication. She was told to see the doctor that treated that condition. R. at 226.

On July 12, 2004, Plaintiff received a letter from University of Health Sciences advising her of the proper method for obtaining prescription refills, which limited refills of

pain medication and muscle relaxers to regularly scheduled appointments: refills would not be prescribed over the phone or after hours. The letter also expressed "great concern regarding over utilization of pain medication and muscle relaxants. Upon review of your chart, we see that this is developing into a health concern. . . . We urge you to schedule a clinic appointment to discuss management of your medical conditions and the medications you are taking." R. at 230.

In August 2004, Plaintiff was referred to the Headache and Pain Center, where she was diagnosed as suffering from fibromyalgia and prescribed Topamax. Plaintiff requested something stronger but was told "we do not prescribe narcotics and I don't recommend them in someone with daily headaches and fibromyalgia." Plaintiff was told to return in two weeks, but she did not. R. at 373-75. In October 2004, Plaintiff returned to IRHC after losing consciousness. She tested positive for opiates and amphetamines; the doctor indicated her fainting was likely caused by the side effects and "over-utilization" of these drugs. R. at 278-79.

On November 8, Plaintiff saw Dr. David Dembinski at Swope Health Center complaining of shoulder pain and reporting that she had been diagnosed with fibromyalgia. She was prescribed soma and advised to go to the emergency room, but refused. R. at 409-10. She went to the emergency room on November 13 complaining of a headache and general body pain; the doctor prescribed Topamax and Darvocet. R. at 275-76.

On January 7, 2005, University of Health Sciences advised Plaintiff that it was severing their treating relationship. R. at 258. Four days later Plaintiff saw Dr. Dembinski complaining of pain; he prescribed Vicodin. R. at 403-04. On January 19, she received a prescription for additional Vicodin to treat shoulder pain. On February 23, Plaintiff told Dr. Dembinski that her shoulder was improving.

Plaintiff returned to the Headache and Pain Center in May 2005. Plaintiff was diagnosed as suffering from chronic headaches, diffuse pain (particularly neck, right shoulder, and arm), depression, anxiety, and Bell's Palsy. An epidural injection was administered for her back pain and provided good relief. The dose of Topamax was increased to help address headaches, and she was also prescribed Tizanidine and

Ultram. R. at 348-72. . Plaintiff reported that her headaches had improved. R. at 320-44.

On June 20, Plaintiff returned to Dr. Dembinski, seeking pain medication. Dr. Dembinski told Plaintiff her headaches could be caused by narcotic pain medication, which made her upset. Nonetheless, he refilled her Vicodin. R. at 397-98. He refilled the prescription again in August. R. at 395-96. Meanwhile, in July she had received medication from the Headache and Pain Center to treat neck pain. R. at 303-05.

In September 2005, Plaintiff complained of neck pain following an automobile accident. X-rays of her spine revealed nothing of note; she was prescribed Norflex, Vicodin, and Naprosyn. R. at 262-64.

On October 12, Plaintiff returned to the Headache and Pain Center complaining that her headaches and pain were worse. An injection was administered, and a prescription for Lidoderm was refilled. R. at 291-98. MRIs of her head and cervical spine were relatively normal. R. at 379-80. One week later, Dr. Dembinski refilled Plaintiff's Vicodin prescription. R. at 393-94.

Over the next six to seven months, Plaintiff's complaints of pain increased. Dr. Dembinski and the Headache and Pain Center exchanged letters. On June 30, 2006, Dr. Scott Goodman at the Headache and Pain Center noted Plaintiff had been "on several chronic pain medications including Vicodin, Ultram, and Klonopin, but it appers to be losing efficacy." Plaintiff also had been taking Topamax and Cymbalta – medications prescribed by Dr. Goodman – but she ran out two months prior and her condition worsened. Dr. Goodman restarted these prescriptions. R. at 455-58. On July 17, Plaintiff told Dr. Dembinski that the injections she received at the Headache and Pain Center were helping; he refilled her prescriptions for Vicodin, Tramadol and Clonazepam. R. at 662-63.

On July 24, 2006, a consultative examination was performed by Dr. Renu Debroy. His examination revealed "tenderness to palpation over her right anterior shoulder" and "in more than 11 of the 18 fibromyalgia trigger points." He opined that Plaintiff suffers from fibromyalgia, impingement of the right rotator cuff, anxiety, migraines, and restless leg syndrome. He recommended that Plaintiff could lift only five

4

pounds occasionally and was limited in her ability to reach or perform repetitive activity over her head. While Plaintiff needed the opportunity to change positions at will, "she would be able to sit, stand, or walk for at least a third of the day in each, in sitting, standing, and walking." R. at 451-52.

In November, Plaintiff told Dr. Dembinski she was expereiencing pain in her back, hip and shoulder; he refilled her prescriptions. On January 5, 2007, Plaintiff reported continuous headaches and that she had fallen inexplicably twice in the last month. Dr. Dembinski diagnosed her as suffering from degenerative disk disease despite the absence of any clinical findings. He prescribed Klonopin, Tramadol, and hydrocodone. R. at 658-59.

On June 20, 2007, Plaintiff was brought to the emergency room after being stopped while driving under the influence. On April 16, 2008, Plaintiff went to KVC Behavioral Healthcare for an initial evaluation, which was completed by Dr. A. Jystene. Plaintiff reported that she had been abusing alcohol for the last sixteen years but stopped four months prior by attending AA; she did not go through a detox or rehabilitation program. She denied using illegal drugs, but admitting to having been arrested for drug possession; she told the therapist the drugs belonged to her ex-boyfriend or ex-husband. Plaintiff's son told the therapist that Plaintiff continued to drink alcohol and that he suspected she was selling her medication. Dr. Jystene told Plaintiff to attend therapy sessions with Jenna Fosakes and indicated plans to "taper off" Zoloft and speak with Dr. Dembinski to see if measures could be taken to avoid Plaintiff's receipt of multiple prescriptions for the same medications. Dr. Jystene indicated Plaintiff's GAF score was 55. R. at 553-57.

Plaintiff saw Dr. Jystene again on June 4. At that time, Plaitniff was taking Zoloft, Lexapro, Klonopin, Cymbalta, Topamax, Requip, Lyrica, Amitrriptyline, Vicodin, Tramadol, and Trazadone. Plaintiff's GAF score was still 55. Dr. Jystene told Plaintiff to continue seeing the therapist. R. at 552.

Approximately two weeks later, Plaintiff was brought to the emergency room after she was found on urinating on the side of the road. She was assessed as intoxicated. R. at 506. On July 16, Plaintiff described the incident to Dr. Jystene as a suicide

attempt, and told her that she had overdosed on alcohol, Xanax, and Klonopin. Dr. Jystene assessed Plaintiff's GAF at 50 and recommended that she be hospitalized. R. at 551. That day, Plaintiff admitted herself to Two Rivers Psychiatric Hospital and she was discharged three days later. The doctor wanted to discontinue her use of Vicodin, but Plaintiff refused. R. at 567-68; 572-74. On July 30, Dr. Dembinski increased Plaintiff's dosage of Vicodin. R. at 642-43.

On July 30, Dr. Dembinski also prepared a letter on Plaintiff's behalf. He indicates he had been treating Plaintiff for several years and had seen her twenty times. He also states Plaintiff suffers from depression and chronic back pain, the latter condition he attributed to "osteoarthritis and compression fractures of at least two of her thoracic vertebrae." He concluded that due to her back pain Plaintiff could not do any work that involved "lifting, bending, stopping, walking, or prolonged standing." He also opined that the pain and depression interfered with her ability to concentrate such that she was incapable of sedentary work. R. at 634.

On August 22, Plaintiff went to KVC and saw Dr. R. Carolina. Dr. Carolina prepared a medical source statement. She opined that Plaintiff was seriously limited in her ability to follow work rules, relate to co-workers, deal with stress, interact with supervisors, maintain concentration, and a host of other work-related functions. R. at 674-75.

Plaintiff testified that when she is on her medication she can stand for two hours at a time before needing to sit down, can walk for fifteen minutes without needing to use a cane. If she stands for too long she falls down. She cannot lift more than a sixteen ounce of water. She can sit for thirty minutes to two hours before her legs start to tingle and her back hurts. R. at 39-42. In fact, she falls "a lot" because her lower back and hips freeze. R. at 60. Plaintiff also testified that fibromyalgia interferes with walking, bending, and other motor functions. R. at 61.

The ALJ elicited testimony from a vocational expert ("VE"). The VE was asked to assume a person of Plaintiff's age, education and work experience who could lift five pounds frequently with her right (dominant) arm, was limited in her ability to reach or perform repetitive activity above her head, with the ability to sit, stand, or walk at least a

third of the day but required an option to sit or stand at will. The VE testified such a person could not perform their past work, but could perform unskilled light work such as office helper, photocopy machine operator, and collator operator. R. at 70-72. The VE was then shown Dr. Carolina's report, and testified that such a person could not perform any work in the national economy. R. at 72-73. In the third hypothetical, the VE was asked to assume the claimant could not lift, bend, stoop, walk, or engage in prolonged standing; the VE testified such a person could not work. R. at 73.

The ALJ found Plaintiff suffers from fibromyalgia, minimal degenerative changes of the thoracic spine, a non-displaced fracture of the right wrist that did not heal properly, tendinosis of the right shoulder, headaches, depression, anxiety, and substance abuse that was not in remission until July 2008. The ALJ found Plaintiff met the listed impairment for substance addiction disorders, Listing 12.09. As required by law, the ALJ then considered whether Plaintiff's alcoholism and drug abuse contributed to her disability; quite logically, the ALJ concluded that Plaintiff's alcoholism and drug abuse contributed to her ability to qualify under the listed impairment for substance addiction disorders. The ALJ then endeavored to ascertain whether Plaintiff had any other combination of impairments that equaled a listed impairment; finding none, the ALJ then ascertained Plaintiff's residual functional capacity excluding the effects of alcohol/substance abuse. The ALJ found Plaintiff could function in the manner described in his first hypothetical, and based on the VE's testimony found she was not disabled.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this

7

standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A.

Plaintiff first faults the ALJ for failing to accept the opinions of treating physicians, failing to develop the Record, ignoring evidence, and rendering an opinion that is not supported by the Record as a whole. The Court disagrees.

#### 1. Development of the Record

The ALJ wrote that Plaintiff "also has a possible personality disorder but it is not well documented in the medical records and substance induced mood disorder has also been diagnosed." R. at 12. Plaintiff relies on this statement to contend the ALJ failed in her obligation to fully develop the record. While the ALJ has a duty to develop the record, that duty is implicated only if the records provided are inadequate. The duty arises if a crucial issue is undeveloped or underdeveloped. Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 39 F.3d 1019, 1023 (8th Cir. 1994). The ALJ noted Plaintiff's personality disorder was likely subsumed within her "substance induced mood disorder," so there was no need to develop the issue further. Moreover, Plaintiff does not suggest she has a personality disorder, nor does she suggest any of the mental health professionals she saw indicated she suffers from one. The ALJ did not err in relying on the Record as it was presented.

8

### 2. Deference to Treating Physicians

Plaintiff contends the ALJ failed to give proper deference to the opinion of Dr. Dembinski. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). The ALJ was suspicious of Dr. Dembinski's reliability given that he never considered or discussed Plaintiff's alcoholism. Dr. Dembinski's conclusion about the severity of Plaintiff's pain was inconsistent not only with his objective findings (which did not support the degree of pain Plaintiff alleged) but the other evidence in the Record. The ALJ also discounted Dr. Dembinski's opinion based, in part, on her finding that Plaintiff had engaged in drug-seeking behavior – suggesting Plaintiff was motivated to exaggerate her pain. Finally, the ALJ was entitled to reject Dr. Dembinski's conclusion that Plaintiff could not work because this opinion was a vocational, not a medical, opinion, so it was an opinion he was not qualified to give.

Plaintiff also argues the ALJ should have deferred to Dr. Carolina's opinion. At the end of the hearing – having already noted that the August 2008 report was the only document from Dr. Carolina – the ALJ asked that additional records from Dr. Carolina be submitted. R. at 75-76. This was not done. The Record is thus devoid of any confirmation that Dr. Carolina has the experience or history with Plaintiff that qualifies her as a treating physician. Moreover, any treatment notes from Dr. Carolina are necessary to provide a basis for her opinions. The ALJ did not err in deciding not to defer to Dr. Carolina's opinions.

### 3. Substantial Evidence in the Record

The ALJ found Plaintiff suffered from medical conditions that could cause pain. This finding does not entitle Plaintiff to benefits. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. E.g., House v.

Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

The ALJ noted multiple inconsistencies in the Record. The degree of pain Plaintiff described was inconsistent with the objective medical evidence. Plaintiff provided conflicting reports about the efficacy of her medication. On those occasions

10

when Plaintiff reported debilitating pain, she appeared to be motivated by a desire to obtain narcotic medication or to obtain excessive amounts of medication by seeking prescriptions from multiple sources. Plaintiff did not seek regular treatment consistent with her alleged pain: while she saw doctors regularly, she only did so when her prescriptions had expired. In other words, Plaintiff would not tell her doctors that the medication was not helping – unless and until she ran out of medicine. A person experiencing the pain Plaintiff has described would have seen the doctor before running out of medicine.

The degree of pain one suffers is highly subjective. The ALJ is charged with the task of determining whether a claimant suffers from debilitating pain. While a different factfinder might arrive at a different conclusion, the decision is ultimately left to the ALJ so long as substantial evidence in the Record as a whole supports it. In this case, there is substantial evidence to support the ALJ's credibility determination and the associated findings regarding Plaintiff's residual functional capacity.

## B.

Plaintiff argues the ALJ failed to follow proper procedure with respect to her alcohol use, and further contends her findings are unsupported. She relies heavily on the fact that she went to the emergency room "only" four times in four years to argue that her use was not as extensive as the ALJ intimated. However, there was much more evidence in the Record, particularly (1) Plaintiff's contradictory statements about the extent and duration of her alcohol abuse, (2) her admission to Dr. Jystene in April 2008 that she had been abusing alcohol for the last sixteen years, and (3) other evidence from the medical records at KVC.

Plaintiff does not clearly identify the procedural error she alleges was committed. Her argument seems focused on the substance of the ALJ's decision.

## C.

Finally, Plaintiff contends her case should be reversed and remanded because a subsequent application for benefits was granted. She concedes the Appeals Council "noted the allowance was based on a worsening of Moore's symptoms." The fact that Plaintiff's condition worsened five months after the period addressed by the instant applications does not bear on whether Plaintiff was disabled in the relevant time period. To the contrary, Plaintiff's conditions are the type that worsen over time. Logically, there is a point at which the conditions were not disabling before they worsened to the point that they were disabling. The fact that Plaintiff became disabled after this decision is not inconsistent with a finding that she was not disabled at the time of this decision.

### III.  CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: November 4, 2010                     UNITED STATES DISTRICT COURT